IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

NICHOLAS TYRONE FALLS, )
)
Plaintiff, )
)
v. ) Case No.
) 13-4169-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
Defendant. )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Nicholas Falls seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding plaintiff's

asthma a non-severe impairment and (2) in failing to consider all the evidence, including the

evidence of plaintiff's treating physicians, when assessing plaintiff's residual functional

capacity. I find that the substantial evidence in the record as a whole supports the ALJ's

finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will

be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On July 12, 2010, plaintiff applied for disability benefits alleging that he had been

disabled since June 1, 1978, amended to July 20, 2010 (Tr. at 165). Plaintiff's disability stems

from Asperger's syndrome[1] and bipolar disorder. Plaintiff's application was denied on October

---

[1]"Asperger's syndrome is a developmental disorder that affects a person's ability to socialize
and communicate effectively with others. Children with Asperger's syndrome typically exhibit
social awkwardness and an all-absorbing interest in specific topics. Doctors group Asperger's
syndrome with other conditions that are called autistic spectrum disorders or pervasive
developmental disorders. These disorders all involve problems with social skills and
communication. Asperger's syndrome is generally thought to be at the milder end of this
spectrum. While there's no cure for Asperger's syndrome, if your child has the condition
treatment can help him or her learn how to interact more successfully in social situations."
http://www.mayoclinic.org/diseases-conditions/aspergers-syndrome/basics/definition/con-

1, 2010.  On January 6, 2012, a hearing was held before an Administrative Law Judge.  On

February 10, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the

Act.  On May 24, 2013, the Appeals Council denied plaintiff's request for review.  Therefore,

the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

decision" of the Commissioner.  The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. §

405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v.

Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the

Commissioner's decision is supported by substantial evidence requires review of the entire

record, considering the evidence in support of and in opposition to the Commissioner's

decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876

F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the

evidence in the record and apply a balancing test to evidence which is contradictory."

Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities &

Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).

However, the substantial evidence standard presupposes a zone of choice within which the

decision makers can go either way, without interference by the courts.  "[A]n administrative

---

20029249

2

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.    Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.    Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Stella Doering, in addition to documentary evidence admitted at the hearing.

## A. SUMMARY OF TESTIMONY

During the January 6, 2012 hearing, plaintiff testified; and Stella Doering, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff lives with his grandparents and his mother (Tr. at 38). He is divorced and has a seven-year-old child who lives with him part of the time (Tr. at 38). "He's with me every day before and after school and every other weekend, although I tend to get him extra weekends as well." (Tr. at 38). Plaintiff has a driver's license and is able to drive himself around without difficulty (Tr. at 38-39).

Plaintiff completed high school and two years of college (Tr. at 39). Although he was not working at the time of the hearing, he did work after his alleged onset date, mowing lawns and teaching piano to one student (Tr. at 39). His grandparents own several properties (two duplexes and three houses) and plaintiff mows those properties for them (Tr. at 39). It takes him 6 to 12 hours per week depending on how much the grass has grown (Tr. at 39). He earns $300 to $400 per month for mowing (Tr. at 39). He earns $60 per month for giving piano lessons (Tr. at 39-40). When asked if he has any difficulties doing the mowing, plaintiff

said that he falls behind sometimes because he has difficulty sleeping and then is too tired to get up and get everything done (Tr. at 40). Sometimes he has had to miss a piano lesson because of not getting enough sleep the night before or not being able to deal with the stress of working with a child, "just stress from everyday goings on; dealing with family and that sort of thing." (Tr. at 53).

Since his alleged onset date, plaintiff has looked for work but has not found anything (Tr. at 40). When asked what kind of work he was looking for, plaintiff said, "Not really looking at any specific lines, just pretty much anything that looked like it might work." (Tr. at 40). He previously worked in management so he looks for that kind of job (Tr. at 40-41). "Usually I seem to do typically best in training, I think, or management." (Tr. at 41). He has not sought any services through vocational rehabilitation (Tr. at 41).

Plaintiff's last job besides mowing and teaching piano was trying to sell meat going door to door (Tr. at 41). He did that for three months full time and was an independent contractor so he really did not make any money (Tr. at 41). He was terminated from that job (Tr. at 41). When asked to describe why, plaintiff said:

> Oh, because he was trying to get me to take another guy out in my personal vehicle to work on a particular day and I was discussing the matter with the gentleman and the manager interrupted us to which I believe I said something to the effect of we're grown men -- I think we can handle this -- thank you -- afer which the manager got quite loud and red faced and got in my face and was yelling at me and such and then fired me.

(Tr. at 53).

Before that he worked at Boone Landing, a retirement community, serving the tables in the dining area (Tr. at 41-42). He did that job 6 to 12 hours a week for 4 or 5 months (Tr. at 42). He left that job to take the meat sales job (Tr. at 42). Plaintiff thinks he was seen as "problematic" because he reported problems in the kitchen to the manager as he was advised to do when he accepted the job (Tr. at 54).

Before that he worked at AB Chance, a factory where he was an anchor bander assembler (Tr. at 42). He worked on the floor assembling parts and getting them ready to ship (Tr. at 42). It was a full-time job and he worked there 2 1/2 years (Tr. at 42). He was on his feet the entire day when he worked there (Tr. at 42-43). Plaintiff never had a problem with performing the job, and he was asked to train people on some of the jobs (Tr. at 56, 57). Plaintiff had some problems on the job "accept[ing] instructions that they gave, particularly in areas where it didn't seem safe." (Tr. at 56). For example, other employees would stack parts with sharp edges sticking out which plaintiff thought was dangerous so he would bring it to management's attention and would be told to mind his own business (Tr. at 56). Plaintiff was terminated for excessive absenteeism (Tr. at 43). When asked why he was missing work, plaintiff said, "I had reached a point where I was unable to handle the stress. It was -- I was working the third shift and was having trouble sleeping during the day and at one point I got so worn down I ended up with shingles." (Tr. at 43). Before that job he worked at Amazing Grace Lutheran Church as Director of Music (Tr. at 43). He did that 4 to 8 hours a week for 3 years earning $120 to $150 per week (Tr. at 43).

He also worked at a dry cleaners while he worked at the church, managing several drop-off locations (Tr. at 43-44). That was a full-time job, and he did that for 3 years (Tr. at 44). He trained employees, but he did not manage people and there was usually only one person working at a time (Tr. at 44). He left the job at the dry cleaners and at the church to move to Columbia, Missouri, and be with family (Tr. at 44). Those jobs at been in Memphis, Tennessee (Tr. at 44).

When asked if he had any trouble doing those jobs, plaintiff said, "At the church there were some issues between myself and one of the deacons and then at the dry cleaners I reported directly to the owner, but there were at least a couple of times when he and I did

come -- have words between us.  Just arguments over procedure or that sort of thing.  Not shouting matches, but perhaps heated discussion." (Tr. at 44).  When asked about the specific problems with the deacon, plaintiff said that the deacon wanted him to attend Sunday school every week which was not part of his job description, and the deacon thought plaintiff was overpaid (Tr. at 54).  At the dry cleaners, the owner got upset when plaintiff called in sick due to the flu, and one time he and the owner had a minor disagreement about store employees not cleaning up after themselves (Tr. at 54-55).

Before working at the dry cleaners, plaintiff worked as a shift manager at a Wendy's restaurant in Memphis (Tr. at 45).  He did that job for 2 or 3 months and left to take the job at the dry cleaners (Tr. at 45).  Plaintiff had problems at Wendy's because he was working at the church as well and needed to be up early on Sundays but he was asked to close the restaurant a lot on Saturday nights which made Sunday mornings more difficult (Tr. at 45).  From 2001 to 2003 plaintiff worked full time in landscaping, first for a company and then after that he was self-employed part time doing landscaping (Tr. at 63).  In landscaping he used rakes, shovels, pruning sheers, saws, etc. (Tr. at 63).  Before moving to Memphis, plaintiff was in college, but before college he worked full time as a delivery driver and manager at a Pizza Hut restaurant (Tr. at 45).  He left that job after 2 1/2 years to go to college (Tr. at 46).  Plaintiff studied piano performance in college but did not graduate (Tr. at 46).  When asked why he did not finish college, plaintiff said, "I burned out -- stress." (Tr. at 46).

Plaintiff's physical problems include his hearing (Tr. at 46).  "I have overly sensitive hearing and I don't tend to normalize background noises, so any sort of high pitched whine or fans running, things like that, stay present rather than passing into background noise." (Tr. at 46).  That is distracting and stressful for him (Tr. at 46).  When he worked at the factory, he wore earplugs to help him deal with the noise (Tr. at 46).  He did not explain how he was able

to use a lawn mower in his most recent job. Plaintiff does not like it when different music is playing in several locations, for example his attorney has one radio station playing in the waiting room and another radio station is playing in his secretary's area (Tr. at 55). That is stressful for plaintiff because he is not able to "settle on one or the other." (Tr. at 55).

He also has sensitive vision "particularly if there are bare light bulbs or flashing fluorescent lights. Things like that can be very difficulty for me to handle." (Tr. at 46-47). The bare light bulb can cause him to squint which gives him a headache (Tr. at 47). He has no other physical problems (Tr. at 47). The hearing and vision problems have always been present, they are a part of autism (Tr. at 47).

When asked to describe his non-physical impediments to working, plaintiff testified as follows:

> A lot of it is social. I have -- I tend to be blunt and I have a hard time knowing when what I'm going to say is going to be taken or how it's going to be taken. I also have a lot of compulsions. I tend to have a pretty heavy compulsion to correct, whether it's logic or speech or grammar, pronunciation, math and also even in regards to your structure. It makes it difficult to be diplomatic sometimes, most all the time. In most work environments there's a need to be able to self-check and that's one of the things which is hard for me to do, is to know how to interact with people in a social setting that doesn't lead to conflict.

(Tr. at 47-48). These social problems have always been present (Tr. at 48). They have not gotten worse or better, they have "pretty much stayed the same" (Tr. at 48). He was not being treated for autism at the time of the hearing (Tr. at 48). He said the lack of treatment was due to lack of insurance, but when asked if he had ever been treated for it, plaintiff said, "No." (Tr. at 48). His doctor tried him on anti-anxiety medications, but at the time of the hearing he was taking medication for attention deficit disorder which seemed to help some (Tr. at 48-49). His medicine helps him focus better on getting tasks accomplished (Tr. at 49). He had been on the medicine for a couple of years (Tr. at 49).

Plaintiff gets up between 6:30 and 7:00 a.m. (Tr. at 49). It is a struggle to get up on time most days (Tr. at 60). He fixes his breakfast without difficulty, and he also prepares breakfast for his son (Tr. at 49). After his son leaves for school, plaintiff cleans up from breakfast and either practices the piano or plays games on the computer (Tr. at 49). If he didn't sleep well the night before, he may lie down and try to sleep while his son is at school (Tr. at 60). If plaintiff gets stressed in the evening, he has trouble sleeping; and he is a light sleeper anyway (Tr. at 60).

He uses email and gets on Facebook (Tr. at 50). Plaintiff does his own dishes, but he does not vacuum because of the noise (Tr. at 50). He is able to manage money fairly well (Tr. at 50). His grandmother does most of the shopping, but he is able to shop for food and person hygiene items (Tr. at 50). Plaintiff does not like going to stores because he is bothered by the sounds, the lights, squeaky wheels on carts, and key machines (Tr. at 50). He eats in restaurants occasionally (Tr. at 50-51). He goes to the movies occasionally (Tr. at 51). His hobby is music (Tr. at 51). He visits friends and friends visit him (Tr. at 51). He attends church weekly (Tr. at 51). He attends school events for his son if they are in the classroom, but not general assemblies (Tr. at 51). The reason for this distinction was described as follows: "Voices in particular I have difficulty with. I always pretty much -- it seems like I hear everything twice. The only way I could describe it would be like if you had everything where it repeated just a fraction of a moment later. In a classroom setting it's advantageous in that I'm able to hear what's being said while writing down the second hearing of it, but in a situation where it's uncontrollable voice or voices. If someone's singing a song that I, whether I like it or not, if I know it at all, it tends to become part of what goes on internally." (Tr. at 52).

Plaintiff testified that he needed someone to go to the Medicaid office with him to pick up application forms because he has "a lot of issues with going into unfamiliar settings." (Tr. at

57).  He filled out the forms a couple months before the hearing but had not gotten them turned in yet (Tr. at 57).  It took a long time to fill them out because he needed someone to sit with him in case he had trouble understanding what was being asked (Tr. at 58).  His mother offered to help him and is unemployed, but plaintiff said they had trouble coming up with an agreeable time to do it (Tr. at 58).

## 2.    Vocational expert testimony.

Vocational expert Stella Doering testified at the request of the Administrative Law Judge.  The first hypothetical involved a person with no exertional limitations but who could only understand, remember and carry out simple instructions; could have only occasional interaction with coworkers, supervisors and the general public; the interaction could not be a primary job requirement; and the job tasks must focus on dealing with things rather than people (Tr. at 65).  The vocational expert testified that such a person could not do any of plaintiff's past relevant work (Tr. at 65).  The person could work as a stubber, DOT 222.687-034, medium exertion with an SVP of 2 (Tr. at 65). There are 900 in Missouri and 62,000 in the country (Tr. at 65).  A stubber works in the back of stores, does not interact with customers, and has only occasional interaction with coworkers or supervisors (Tr. at 65).  The person could also work as a lab equipment cleaner, DOT 381.687-022, medium exertion with SVP of 2 (Tr. at 65). There are 850 in Missouri and 29,000 in the country (Tr. at 65).  The person could work as a linen supply load builder, DOT 920.687-118, light exertion with an SVP of 2 (Tr. at 66). There are 1,100 in Missouri and 51,000 in the country (Tr. at 66).

The next hypothetical was the same as the first except the person would be off task 20 percent of the workday (Tr. at 66).  The vocational expert testified that if a person were off task an average of 20 percent of the day on a consistent basis, he could not work (Tr. at 66).

If a person were to miss two or more days of work a month on an unscheduled basis, he could not work (Tr. at 66).

## B.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1993 through 2010:

| | |
|---|---|
| 1993 total earnings (age 16) | $ 1,986.18 |
| 1994 total earnings (age 17) | $ 4,957.45 |

| 1995 | |
|---|---|
| Scheffler Enterprises | 2,214.54 |
| Wal-Mart Stores | 5,661.63 |
| Veterans Affairs Financial Service Center | 112.43 |

1995 total earnings (age 18)                   $ 7,988.60

| 1996 | |
|---|---|
| Missouri Introductions, Inc. | 349.80 |
| Dunafon Enterprises, Inc. | 2,730.48 |
| Burger King | 25.47 |
| Jejoja Tom-Con II, Inc. | 1,080.08 |
| Tri-Con Industries | 568.76 |
| Wal-Mart | 3,380.01 |
| Veterans Affairs | 461.45 |

1996 total earnings (age 19)                   $ 8,596.05

| 1997 | |
|---|---|
| Kraft Foods | 4,865.79 |
| Burger King | 122.38 |
| Jejoja Tom-Con II, Inc. | 79.04 |
| Adams Company | 670.25 |
| Jejoja Con, Inc. | 632.28 |
| Tri-Con Industries | 543.14 |
| Pizza Hut | 4,484.08 |

1997 total earnings (age 20)                   $ 11,487.85

<u>1998</u>
Pizza Hut          7,284.63

1998 total earnings (age 21)    $ 7,284.63

<u>1999</u>
Pizza Hut          2,981.82

1999 total earnings (age 22)    $ 2,981.82

<u>2000</u>
Pizza Hut          888.87
Moresource, Inc.          750.76
Curators of the University of Missouri          667.74

2000 total earnings (age 23)    $ 2,307.37

<u>2001</u>
Charming Shoppes, Inc.          912.52
Candlelight Terrace          1,018.77
Curators of the University of Missouri          2,074.50

2001 total earnings (age 24)    $ 4,005.79

<u>2002</u>
Directory Distributing Associates          554.75
Curators of the University of Missouri          59.89
Self employment          2,217.00

2002 total earnings (age 25)    $ 2,831.64

<u>2003</u>
Valenti Mid-South Management          2,636.48
Crescent Cleaners          1,264.00
Amazing Grace Lutheran Church          7,350.00
Schaffer Corporation          8,340.92

2003 total earnings (age 26)    $ 19,591.40

<u>2004</u>
Schaffer Corporation          15,299.89
Self employment          1,040.00

2004 total earnings (age 27)    $ 16,339.89

<u>2005</u>
| | |
|---|---|
| Amazing Grace Lutheran Church | 8,225.00 |
| Schaffer Corporation | 13,733.76 |

2005 total earnings (age 28)                $ 22,457.76

<u>2006</u>
| | |
|---|---|
| Hubbell Power Systems, Inc. | 7,898.60 |
| C&S Business Services | 8,301.56 |
| Amazing Grace Lutheran Church | 1,050.00 |
| Healthy Alliance Life Insurance | 439.28 |
| Schaffer Corporation | 2,423.57 |

2006 total earnings (age 29)                $20,113.01

<u>2007</u>
| | |
|---|---|
| Hubbell Power Systems, Inc. | 22,084.09 |

2007 total earnings (age 30)                $22,084.09

<u>2008</u>
| | |
|---|---|
| Hubbell Power Systems, Inc. | 6,167.88 |
| Self employment | 2,771.00 |

2008 total earnings (age 31)                $ 8,938.88

<u>2009</u>
| | |
|---|---|
| Harvest Management Sub LLC | 724.63 |

2009 total earnings (age 32)                $ 724.63

<u>2010</u>
| | |
|---|---|
| Harvest Management Sub LLC | 1,338.20 |

2010 total earnings (age 33)                $ 1,338.20

2011 total earnings (age 34)                $ 0.00

(Tr. at 147-153).

**Work History Report**

In a work history report dated May 11, 2010, plaintiff explained that his difficulty working stems from his strict adherence to employee handbooks and company policies and he has conflicts with supervisors when they try to cut corners or fail to adhere to policy

"especially when safety is concerned. . . . I[,] having been in management in [the] past[,] understand what is expected of both manager and employee alike. When working I conduct myself as though I were my manager . . ." (Tr. at 216).

**Work Activity Report**

In a work activity report dated July 22, 2010, plaintiff reported that he has a lawn business at which he works about 16 hours per month mowing yards (Tr. at 189-191). "I started this work after my illnesses began." He is the sole owner and decision maker for his business.

**Function Report Adult - Third Party**

Plaintiff's grandmother completed a Function Report on August 9, 2010 (Tr. at 199-206). She stated that she sees plaintiff daily and that they work in the yard together. When asked to describe plaintiff's day, she wrote, "dress, work in yard, plays piano. He cares for his son without assistance. . . . Has always had this condition." Plaintiff has no problems with personal care. He needs no special reminders, he prepares his own complete meals daily, he is able to do household chores indoors and outdoors such as cleaning, laundry, household repairs, ironing, mowing. He goes outside often and is able to walk, drive a car or ride in a car. He can go out alone and he can drive. He shops in stores for food and clothes. When asked about his ability to handle money, Ms. Pennell wrote, "Can't pay bills, can't keep job, so hasn't got money to pay bills." He plays the piano and plays video games; he spends time with others on the phone, on the computer and in person. He is easily upset. His condition affects his ability to understand and to get along with others. It does not affect any physical ability. His condition does not affect his ability to follow directions, remember, complete tasks, or concentrate. He follows written instructions very well, he follows spoken instructions very

well, and he gets along with authority figures "average".  Plaintiff does not handle stress "at all" and does not handle changes in routine well.

**Function Report**

In a function report dated August 10, 2010, plaintiff described his day as getting up, getting ready for the day, doing yard work, practicing the piano, reading, and doing chores (Tr. at 220-227).  Plaintiff's mother is disabled and requires his help, plaintiff takes care of his son, and plaintiff helps take care of his grandparents.  Plaintiff's condition is congenital.  Sleep is often difficult if his environment or routine change.  He has no difficulty with self care.  He prepares his own meals from scratch every day.  He cleans, does general repairs, mows, does laundry, etc.  It takes him "less time than average" to do these things.  He is able to drive a car, he goes out daily and can go out alone, he shops in stores, by phone, by mail and by computer for anything he wants "up to 3 hours."  He can handle money without difficulty.  His hobbies include writing and playing music for piano, gardening, writing poetry, and computer games; and he does these things "daily and quite well."  He does social networking on line, he goes out to eat on occasion, he goes to church, and he talks on the phone.  He has "general difficulties with socializing."

His condition affects his ability to talk, hear, see, remember, complete tasks, concentrate, understand, follow instructions and get along with others.  He can follow written instructions very well if they are clearly written out.  He can follow spoken instructions very well.  His condition leads to inflexibility in regard to routine and rules which "leads to conflicts where those in authority may see rules as flexible."  He is not able to handle stress or changes in routine well.  "My behavior is based on a different set of values than a neuro-typical person's might be."

I was diagnosed with Asperger's in March of 2010.  Symptoms of this condition showed up as early as 10 months of age.  Some of the symptoms are sensitivities to light and

sounds. The greatest problems are, however, in social interactions. My condition causes my brain to interpret language litterally [sic] and I see things typically as black and white, right and wrong. My poor social skills cause great stress and make holding a job very difficult for me.

## Function Report Adult - Third Party

Plaintiff's mother completed a function report on August 17, 2010 (Tr. at 232-239). Ms. Falls stated that she does not spend much time with plaintiff because he can be irrational and verbally abusive. Because plaintiff's mother indicated that she does not spend much time with plaintiff and because many of her answers conflict[2] with the reports of plaintiff and his grandmother with whom he lives, I will not further summarize this function report.

## Statement of Other Person

Plaintiff's mother wrote a letter dated November 17, 2011 (Tr. at 267-268). Plaintiff's mother described plaintiff as having a bad temper, wanting things done on his schedule, not doing laundry, taking food into his room when he has been told not to, leaving dirty dishes for others to wash, not cleaning out his car. Yet he will sometimes take several showers a day or soak in a jetted tub for an hour or two. He comes across as cocky to other people. Plaintiff's son has autism. Plaintiff was able to attend a family gathering but complained about something minor such as his son's cup. Plaintiff's mother asked him to hang a mirror for him and two years later he still had not done it.

## I.Q. Testing

On November 7, 1989, plaintiff's IQ tested as 123 verbal, 111 performance, and a full scale I.Q. of 120 (Tr. at 297).

---

[2]For example, she stated that plaintiff does not care for any other person, he does not prepare his own meals, he no longer does gardening, he rarely goes anywhere.

## C.   SUMMARY OF MEDICAL RECORDS

On July 8, 2009, plaintiff saw Jeffery Belden, M.D., for a refill of Albuterol for asthma (Tr. at 347-348, 415-417).  "Nicholas is a 31-year-old male that I used to take care of at my previous practice."  Plaintiff had a rash on his chest for which Dr. Belden prescribed Ketocorazole.  "He has had some psychiatric difficulties.  He has had sort of a variety of different diagnoses applied.  I thought he might have had attention deficit disorder in the past, but he had no clear cut response to treatment.  He may have bipolar disorder.  He mentioned that his grandmother had bipolar disorder and did very well with Triavil, which is a combination of Amitriptyline [antidepressant] and an antipsychotic.  He has anxiety episodes daily and has depression for many months now.  He has been out of work for about 1 year.  He has an interview Tuesday.  He has had marital problems about 4 years.  Appetite is up and down.  Mood is 1/10 scale right now.  Nicholas has migraines about 4 per month.  He thinks he may have Asperger syndrome, partly because his son is autistic, and he has been reading about those disorders.  He thinks his own personal picture fits Asperger's better."  Plaintiff was weighed, his heigh was measured, his blood pressure was taken.  Dr. Belden observed the skin rash.  "No additional exam."  He assessed tinea versicolor (fungal skin infection), generalized anxiety disorder, asthma, bipolar disorder, and migraines.  Dr. Belden refilled plaintiff's Albuterol inhaler.  He prescribed Carbamazepine for bipolar disorder and Citalopram for anxiety and mood, and he indicated he would find someone to evaluate plaintiff for Asperger Syndrome.

On September 2, 2009, plaintiff was seen by Jeffery Belden, M.D. (Tr. at 344-346, 418-420).  Plaintiff reported that his asthma was doing well, he was having no adverse effects from his medication and "no episodes for months."  His migraines were "doing well" with no adverse effects of medication and no migraines in the past month.  Plaintiff had stopped taking

Citalopram for anxiety because he said it disrupted his sleep schedule.  He reported "prior success with Carbamazepine [mood stabilizer] and Adderall [treats ADHD]. Best productivity." Plaintiff was on Carbamazepine for bipolar disorder and it was described as "very effective." He as using Albuterol inhaler 15 minutes before exercise for asthma, Ketocorazole (for chronic fungal skin infection), and Carbamazepine (for bipolar disorder).  On exam he was observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. Dr. Belden prescribed Adderall 10 mg twice a day in place of Citalopram.

On October 2, 2009, plaintiff (age 32) was seen at the Autism Clinic by Karen Visovsky, M.Ed., who administered the Autism Diagnostic Interview-Revised (ADI-R) (Tr. at 330-335, 399-404).  Plaintiff's mother was the primary informant.  "Due to [plaintiff's] age and his report that his mother may need some assistance with the assessment, he was present and provided some responses to the assessment items.  Nicholas and his mother were informed that with Nicholas as a partial informant, the assessment is technically not valid." Plaintiff also completed the Broad Autism Phenotype Questionnaire (BAPQ), a "self-reporting tool to supplement this assessment".  Plaintiff was at the time living with his wife and son.  Plaintiff's son was diagnosed with autism at age 2, and because of that and plaintiff's own "social concerns" he was interested in being examined for the possibility of an autism diagnosis for himself.  Plaintiff's scores on the ADI-R "were not clinically significant to support a diagnosis of an autism spectrum disorder."  Plaintiff's mother indicated that all of his milestones for development were normal.  She first noticed differences in his development in first grade because his academic abilities were delayed and he appeared to be distracted at school.  As to social interaction, plaintiff's mother's responses were that he was normal except he needed adult prompting to share physical items with others and sometimes had difficulty offering comfort to others.  "Overall, the test results suggest that, according to his mother's report,

Nicholas did not demonstrate clinical significance on the ADI-R. Nicholas' scores on the BAPQ are clinically significant and support a diagnosis of an autism spectrum disorder."

On October 8, 2009, plaintiff saw Jeffery Belden, M.D., for medication refills and a follow up (Tr. at 342-343, 421-422). Plaintiff reported that the Adderall had been of some help. "Helped follow through on appts and job apps." He reported no loss of appetite, insomnia, jitteriness, or weight loss. Plaintiff was on Albuterol (inhaler for use as needed before exercise), Ketocorazole (for chronic fungal skin infection), Carbamazepine (treats bipolar disorder), and Amphetamine-dextroamphetamine (also called Adderall, treats ADHD). On exam plaintiff was noted to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. He was assessed with attention deficit disorder. Plaintiff said he found his old prescription from 2003 and it had been 20 mg twice a day and "that dose worked better." Dr. Belden increased plaintiff's dose of Adderall to 20 mg twice a day.

On December 11, 2009, plaintiff saw Jeffery Belden, M.D., for medication refills and a follow up (Tr. at 336-338, 423-425). "Has been on the current dose of stimulant medication successfully for some time. No loss of appetite, insomnia, jitteriness, or weight loss. Varies dose when situation requires or allows it." Plaintiff was on Albuterol (inhaler for use as needed before exercise), Ketocorazole (for chronic fungal skin infection), Carbamazepine (treats bipolar disorder), and Amphetamine-dextroamphetamine (also called Adderall, treats ADHD). On exam plaintiff was observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. He was assessed with attention deficit disorder. His medications were refilled.

On March 2, 2010, plaintiff saw David Beversdorf, M.D., in the neurology clinic at University of Missouri Health Care (Tr. at 349-353, 388-397). Plaintiff reported low grades in elementary school caused by his dislike of "busy work", and he blamed that on his needing to

help around the house since his mother had limb-girdle and muscular dystrophy. Plaintiff reported toe walking as a child. After completing two years of college, he became stressed out and dropped out. "One thing that he did not appreciate is that they are very heavily weighted on attendance." After dropping out of college, plaintiff moved to Memphis, Tennessee, for three years where he played piano for a church and was manager of a dry cleaner and laundromat. He met a woman, married, and had a son. His wife already had five children. After three years in Memphis, he moved back to Columbia. He was let go from a factory job due to missing work. "He became tired of the political environment at work." At the time of this medical appointment plaintiff was working part time as a server in a restaurant. "He is looking for full time employment. He likes landscaping, music and maintenance work and has skills in these areas." Plaintiff reported having friends with whom he socializes, such as going to movies, hiking and camping. He likes to play the piano, write and arrange music, and write poems. Plaintiff reported having been prescribed Carbamazepine at age 25 due to being overly emotional "and it did help significantly according to his recollection. He also takes dextroamphetamine 20 mg twice a day. This was started in college for ADHD and this did help him focus." Plaintiff had been separated from his wife for the past year.

On exam plaintiff was observed to be alert and appropriate, very quiet but with appropriate eye contact. "[T]he patient . . . responds appropriately to all questions and follows commands reliably." His entire physical exam was normal, his gait was normal. "I did not note any toe walking today." Dr. Beversdorf reviewed the October 2, 2009, autism evaluation and noted that the results were considered invalid but that plaintiff's personal questionnaire indicated autism spectrum disorder. "Based on the BAPQ [the self-reporting questionnaire] as a more reliable indicator given the inadequate history for the ADI-R, I consider this patient's diagnosis consistent with Asperger's syndrome. . . . We will obtain formal neuropsychological

testing to better help guide him in the future and we will also send him to our Social Services Team for optimal access to the Regional Center as well as for vocational support given this diagnosis." Plaintiff was told to return in 4 months for follow up of the neuropsychological testing.

On March 12, 2010, plaintiff saw Jeffery Belden, M.D., for medication refills and a follow up (Tr. at 336-338, 426-428). "Has been on the current dose of stimulant medication successfully for some time. No loss of appetite, insomnia, jitteriness, or weight loss. Varies dose when situation requires or allows it. He is pursuing a job on a cruise ship where he would play piano, and be gone 6 months at a time." Plaintiff reported about 3 episodes of anxiety each week lasting about 15 minutes. He "just rides them out." Plaintiff was on Albuterol (inhaler for use before exercise), Ketocorazole (for chronic fungal skin infection), Carbamazepine (treats bipolar disorder), and Amphetamine-dextroamphetamine (also called Adderall, treats ADHD). Plaintiff was observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. He was assessed with attention deficit disorder. His medications were refilled.

On July 12, 2010, plaintiff applied for disability benefits.

July 20, 2010, is plaintiff's amended alleged onset date.

On August 3, 2010, plaintiff returned to see David Beversdorf, M.D. (Tr. at 361-363, 377-379, 405-407). "We had previously ordered formal neuropsychological testing to help guide us in the future, consulted social services for optimal access to the regional center, as well as for vocational support. However, as he has no insurance, we would not be able to access neuropsychological testing. He had difficulty understanding instructions over the

phone from social services.[3]  So, today, he met with our social services team in person."
Plaintiff asked Dr. Beversdorf about anxiety medications.  Under physical examination, Dr.
Beversdorf wrote only: "The patient was alert and appropriate and interacts well with me,
although continues to be very quiet and seems to have trouble processing information when
presented too rapidly."  Under assessment and plan, he wrote, "I went into continued detailed
discussion with the social services team to help with his getting on SSI and Medicaid, and then
we can obtain neuropsychological testing to further supplement his access [to] his services,
such as vocational rehabilitation and the regional center."  Dr. Beversdorf talked to plaintiff
about anti-anxiety medications, but plaintiff said he would rather follow his anxiety with Dr.
Belden.  Dr. Beversdorf told plaintiff to come back in 6 to 8 months.

On August 4, 2010, plaintiff saw Jeffery Belden, M.D., for medication refills and follow
up (Tr. at 380-382, 429-431).  With regard to plaintiff's attention deficit disorder, Dr. Belden
noted that plaintiff "has been on the current dose of stimulant medication successfully for some
time.  No loss of appetite, insomnia, jitteriness, or weight loss."  He then noted the following:
"Fairly disabling anxiety, complicating his Asperger's syndrome. . . .  Seeing a counselor.
Marital stresses.  Separated for past 1.5 yr.  Would like to try a medication, and Dr. Beversdorf
suggested buspirone.  Some sleep issues maybe a third of the time due to anxiety."  Plaintiff was
observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood
and affect.  He was assessed with attention deficit disorder, anxiety not otherwise specified, and
Asperger's disorder.  Dr. Belden refilled plaintiff's medication and added Buspirone for anxiety,
three pills per day with 12 refills.

---

[3]This conflicts with both plaintiff's report and his grandmother's report in Function Reports
that plaintiff is able to follow spoken instructions "very well."

On August 6, 2010, Dr. Beversdorf prepared a form entitled "Nurse Management Actions" regarding his visit with plaintiff three days earlier (Tr. at 375-376, 408-409). "I went into continued detailed discussion with the social services team to help with his getting on SSI and Medicaid, and then we can obtain neuropsychological testing to further supplement his access [to] services, such as vocational rehabilitation and the regional center."

On September 30, 2010, in connection with plaintiff's application for disability benefits, Stanley Hutson, Ph.D., completed a Psychiatric Review Technique in which he found that plaintiff's mental impairment (attention deficit disorder and probable Asperger's Syndrome) is not severe (Tr. at 364-374). He found that plaintiff had only mild difficulties in restriction of activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. In support of his findings, Dr. Hutson noted that plaintiff has some college education and has a lawn business. "He has anxiety and depression after being out of work and having marital problems. . . . He is alert and oriented at exams and is cooperative with appropriate mood and affect. In 3/2010 he was considering a job on a cruise ship as a piano player." Dr. Hutson reviewed plaintiff's neurology clinic notes, his autism questionnaires and the notes of his visits to the Autism Clinic with Dr. Beversdorf, his daily activities questionnaires, third party forms, and his work history. "He has mental disorders but has been able to work. His mental disorders do not cause severe limitations related to the ability to work."

On November 10, 2010, plaintiff saw Jeffery Belden, M.D., for medication refills and a follow up (Tr. at 432-434). With regard to attention deficit disorder, Dr. Belden noted that plaintiff has "been on the current dose of stimulant medication successfully for some time. No loss of appetite, insomnia, jitteriness, or weight loss." Plaintiff reported excessive sweating and minimal benefit from Buspirone which had been prescribed on his last visit. Plaintiff was

observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. Dr. Belden assessed attention deficit disorder and anxiety not otherwise specified. He refilled plaintiff's ADD medication and prescribed Venlafaxine for anxiety.

On December 22, 2010, plaintiff saw Jeffery Belden, M.D., for medication refills and a follow up (Tr. at 435-437). "He wonders if the Adderall is working as well as it did in the past. Has been on the current dose of stimulant medication successfully for some time. No loss of appetite, insomnia, jitteriness, or weight loss." Plaintiff "self-discontinued" his anti-anxiety medication after a month or so indicating that it made him feel nauseated. "Legal wrangling over child care. He finds working with kids rewarding. Thinking of getting job working w/special needs kids." He was observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. Dr. Belden refilled plaintiff's Adderall at the same dose.

On February 15, 2011, plaintiff saw Saleh Parvez, M.D., with a chief complaint of, "I have difficulty in being diplomatic with people. I am too direct." (Tr. at 411-414). Plaintiff told Dr. Parvez that his wife had filed for divorce in September 2010, and they were having a custody battle for his son at this time. "The patient thinks he understands his son better, having a similar spectrum of pathology."

> I have gone through the information given by his grandma to his attorney who is filing for Social Security Disability benefits and Medicaid. According to his mother's statement, he is sometimes difficult to communicate [with] because of the irrational and verbally aggressive behavior. Also, he stays in his room quite a bit of time by himself, sort of boxed in. He used to have a working lifestyle, very interactive. However, now depressed and has no motivation.

> Dr. Parvez described plaintiff as a gentleman "who is pleasant, interactive." Plaintiff

reported that he stays irritable at times, he worries a lot, "otherwise, no OCD [obsessive compulsive disorder], panic disorder or PTSD [post-traumatic stress disorder] symptoms could be appreciated. I could not also find any classic symptoms of mania." Plaintiff reported being

unemployed but giving piano lessons to one student. He was a real estate broker, then went to college for two years studying piano. "He drinks every day some vodka or whiskey but never got drunk or DUI or no public intoxication. He is fighting a custody battle for his son, and he thinks that his son would be better off staying with him because he understands him better." Plaintiff was observed to be alert and oriented times four, cooperative with full affect but anxious mood. His thought content was free from psychosis "except a little paranoia here and there." His thought processes were logical and goal directed. His attention and memory were intact. His insight and judgment were intact. Fund of knowledge was above average.

Dr. Parvez's impression includes the following: "Mr. Falls presents himself as a very pleasant, interactive person." However, "according to his mother's statement," he gets easily irritable and inappropriate verbally, he was in speech therapy at the age of 4, and his history shows a "struggle with his diagnosis of Asperger's as far as the social interaction and learning go. . . . I will not be surprised that Mr. Falls will have difficulty in maintaining and performing well in a steady job for a reasonable time due to his limitation by Asperger's. He is currently getting treatment symptomatically for his attention deficit hyperactivity disorder and stress disorders." Dr. Parvez assessed ADHD, "stable by medication"; anxiety not otherwise specified; Asperger's disorder; and a GAF of 45. He recommended plaintiff continue Adderall. He prescribed Vistaril for anxiety as needed. Plaintiff was no longer taking the Buspirone that had been prescribed by Dr. Belden on August 4, 2010, "for adverse effects or some other reason."

On May 20, 2011, plaintiff saw Jeffery Belden, M.D., for medication refills and for a follow up (Tr. at 438-440). "Has been on the current dose of stimulant medication successfully for some time. No loss of appetite, insomnia, jitteriness, or weight loss." Plaintiff was observed to be alert and oriented, in no acute distress, and cooperative with appropriate mood and affect. Dr. Belden refilled plaintiff's Adderall at the same dose.

On August 29, 2011, plaintiff saw Jeffery Belden, M.D., for medication refills (Tr. at 444-446). "Has been on the current dose of stimulant medication successfully for some time. No loss of appetite, insomnia, jitteriness, or weight loss." His asthma was doing well, and he was having no adverse effects from his medication. Plaintiff asked to get back on Carbamazepine. Plaintiff reported that it seemed to help before but caused an onion-scented sweat. "Feeling more stressed w/more mood swings. No current mania." Plaintiff was observed to be alert, oriented, in no acute distress, and cooperative with appropriate mood and affect. Dr. Belden refilled plaintiff's Adderall at the same dose. He also prescribed Carbamazepine.

On December 21, 2011, Jeffery Belden, M.D., wrote a letter to whom it may concern (Tr. at 442-443). Dr. Belden indicated that there has always been some uncertainty as to what plaintiff's psychiatric diagnoses are, but "I think he most clearly has Asperger's syndrome, but I suspect he has other psychiatric disorders as well."

I cannot imagine him holding down a job for any length of time at all.

Although he has a pleasant appearance and often has a smile, his behavior is pretty erratic and having a conversation with him feels exhausting. His follow-through is horrible. He has problematic relationships with his mother, his grandmother, and his ex-wife. He demonstrates avoidance behavior in many realms of life (follow-up to medical recommendations, performing agreed upon duties at home, etc.).

I think neuropsychological testing would be a great help in clarifying his psychiatric diagnoses. He has sought care at the Thompson Center, where he had the diagnosis of Asperger's Syndrome confirmed. He has never had consistent ongoing care from a psychiatrist or psychologist, though he has had a few scattered mental health visits. As his family physician, I have provided most of his mental health care, and it has been most challenging.

If he were to attempt employment I think it would require some persistent job coaching in order to help him acquire the skills and experience to get along with coworkers, supervisors and the public. Otherwise I don't think he could successfully perform his job duties. I think his outlook for employment sucess [sic] his [sic] poor.

He would likely require significant accommodation from his employer (erratic absences, allowing isolation, etc.) should he attempt employment.

On December 23, 2011, plaintiff was evaluated by Brick Johnstone, Ph.D., at the University of Missouri (Tr. at 449-453).

Mr. Falls . . . [was] referred for a neuropsychological evaluation to assist in determining his appropriateness to hold competitive employment or to receive disability. All information was obtained in an interview with Mr. Falls and review of medical records and material supplied by his attorney.

. . . Current Thompson Center goals are to assist Mr. Falls in obtaining social security disability and Medicaid.

Mr. Falls reports that his primary symptoms of Asperger's disorder relate to social difficulties, feeling socially uncomfortable, and having difficulty understanding social cues. He states he is overly concerned with the truth and expressing his opinions, has interpersonal conflicts, concrete and literal thinking, comes across as blunt and rude, cannot tolerate imperfection, has problems learning new things, is overwhelmed in new situations/settings, and has difficulties working with other people and particularly people he perceives as being the "alpha male." He is also overly sensitive to noises and is anxious in places with new smells and sounds. All of these longstanding difficulties have caused him considerable difficulties at school and work and have kept him from finding and maintaining consistent competitive employment.

Vocationally, Mr. Falls was last employed mowing lawns for his grandparents last summer. He currently teaches piano lessons to one child one time per week. In the past he has worked as a door to door salesman, as a server at Boone's Landing, as a factory laborer, and in fast food. His longest work was as a director of music at a church for 3 years and as a clerk/manager of a dry cleaning store for 3 years. He reportedly has been fired from most of these jobs for excessive absences (he does not go into work when he is "overstressed"), insubordination (i.e., arguing with his supervisors), conflicts with management, and difficulties getting along with his co-workers.

Mr. Falls has 2 years of college . . .

Mr. Falls suffers from asthma and reports being oversensitive to noises. He has also had problems with depression and is currently feeling several social stressors (i.e., pending divorce, son with Autism). He reports ongoing difficulties with anxiety and particularly when in new places or learning new things. He has been seen briefly in counseling but is not currently.

SUMMARY OF EVALUATION FINDINGS

Overall the current interview and review of previous records suggest that Mr. Falls suffers from Asperger's disorder with his most prevalent symptoms including significant limitations in social functioning. Specifically, he has difficulties interacting with others, reading social cues, becoming anxious in social settings, and getting along with others. These difficulties have reportedly caused him consistent difficulties in

finding and maintaining competitive employment. As a result, it is believed that Mr. Falls is disabled due to his Asperger's disorder and is appropriate to receive benefits at the current time.

* * * * *

DIAGNOSTIC IMPRESSIONS

Axis I:     Asperger's Disorder; Generalized Anxiety Disorder, by history; ADHD, by history.

Axis II:    Learning Disorder, by history.

Axis III:   Asthma

RECOMMENDATIONS

1.     Due to his Asperger's disorder (diagnosed by two physicians, confirmed by the current evaluation), and his longstanding difficulties holding competitive employment for many years, Mr. Falls is believed to be appropriate to receive social security disability at this time. Without appropriate services to manage his social skills deficits and related psychological difficulties, he will not likely be able to hold competitive employment. This is believed to be the case for at least a year.

2.     Consistent with the goals of the Thompson Center staff, Mr. Falls will benefit from receiving Medicaid. . . .

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Kevin Martin entered his opinion on February 10, 2012 (Tr. at 15-26). Plaintiff's last insured date was December 31, 2013 (Tr. at 17).

Step one. Plaintiff has not engaged in substantial gainful activity since his amended alleged onset date (Tr. at 17). Plaintiff worked mowing lawns and teaching piano lessons after his alleged onset date, but his earnings did not rise to the level of substantial gainful activity (Tr. at 17).

Step two. Plaintiff suffers from the following severe impairments: Asperger's disorder, generalized anxiety disorder, and attention-deficit disorder or attention-deficit hyperactivity disorder (Tr. at 17). Plaintiff's asthma and migraine headaches are not severe impairments

28

because they are managed medically and "should be amenable to proper control by adherence to recommended medical management and medication compliance." (Tr. at 18).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 18-20).

Step four.  Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels with the following limitations:  He is limited to work involving only simple instructions; he is limited to only occasional interaction with coworkers, supervisors, and the general public;  social interaction may not be the primary job requirement; and job tasks must focus on dealing with things rather than people (Tr. at 20). With this residual functional capacity, plaintiff cannot perform any of his past relevant work (Tr. at 24).

Step five.  Plaintiff is capable of working as a stubber, lab equipment cleaner, or linen supply load-builder, all available in significant numbers (Tr. at 25).  Plaintiff has therefore not been under a disability at any time from his amended alleged onset date through the date of the ALJ's opinion (Tr. at 25).

## VI.    *ASTHMA*

Plaintiff argues that the ALJ erred in finding that plaintiff's asthma is not a severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

(a)     Non-severe impairment(s).  An impairment or combination of
impairments is not severe if it does not significantly limit your physical or mental ability
to do basic work activities.

(b)  Basic work activities.  When we talk about basic work activities, we mean
the abilities and aptitudes necessary to do most jobs.  Examples of these include--

(1)     Physical functions such as walking, standing, sitting, lifting,
pushing, pulling, reaching, carrying, or handling;

(2)     Capacities for seeing, hearing, and speaking;

(3)     Understanding, carrying out, and remembering simple
instructions;

(4)     Use of judgment;

(5)     Responding appropriately to supervision, co-workers and usual
work situations; and

(6)     Dealing with changes in a routine work setting.

Plaintiff bears the burden of establishing that an alleged impairment is severe.  Caviness

v. Massanari, 250 F.3d 603, 604-605 (8th Cir. 2001).  While severity is not an onerous

requirement, it is not a "toothless standard," and claimants must show more than minimal

interference with basic work activities.  Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007).  To

be considered severe, the impairment "must result from anatomical, physiological, or

psychological abnormalities which can be shown by medically acceptable clinical and

laboratory diagnostic techniques . . . and must be established by medical evidence consisting of

signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."

Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

The ALJ had this to say about plaintiff's asthma:

In addition to the above severe impairments, there is evidence in the medical record
that the claimant has been diagnosed with and treated for asthma and migraine
headaches.  However these conditions were being managed medically, and should be
amenable to proper control by adherence to recommended medical management and
medication compliance.  In September 2009, both of these impairments were noted to
be doing well with no recent episodes.  Throughout the remainder of treatment notes,

the claimant is prescribed medication for his asthma and as late as August 2011 is noted that his asthma is doing well. There is also no evidence of [any] hospitalizations or emergency room visits for either of these impairments. Furthermore, no aggressive treatment was recommended or anticipated for these conditions. The claimant's asthma and migraines do not cause more than minimal limitation in the claimant's ability to perform basic work activities. Accordingly, these impairments are nonsevere.

(Tr. at 18).

Although plaintiff argues at length about what "could" happen with asthma, he does not cite to any part of the record establishing that he ever complained of any asthma symptoms at any time. Neither does he identify what basic work activity is limited by his asthma.

On July 8, 2009, Dr. Belden refilled plaintiff's Albuterol inhaler for asthma. Plaintiff had indicated that he needed a refill -- he did not describe any difficulties he was having with his asthma and none were observed. On September 2, 2009, plaintiff reported his asthma as doing well and he was having no adverse side effects from his medication. He had had no episodes of asthma for months. Plaintiff was directed to use his inhaler 15 minutes before exercise "PRN" which means "as needed." There is no mention of asthma again until August 29, 2011, at which time plaintiff described his asthma as doing well with no adverse side effects from his medication. His Albuterol inhaler was again prescribed to be used 15 minutes before exercise as needed.

In his function report, plaintiff stated that his impairments do not affect his ability to lift, walk, or climb stairs. He testified during the hearing that sounds and lights bother him but that he has no other physical problems.

Reviewing the basic work activities described in the regulations, it is clear that the ALJ properly found plaintiff's asthma to be a nonsevere impairment as none of these activities are impaired by plaintiff's asthma. Plaintiff reported in his administrative documents and he testified at the hearing that he has no limitations in his ability to walk, stand, sit, lift, push, pull, reach, carry, or handle. His seeing and hearing are impacted by his intolerance to certain

sounds and lights due to Asperger's, not because of asthma. No difficulty with speaking was alleged or observed. He claimed in his function report that his ability to remember, complete tasks, concentrate, understand, follow instructions and get along with others is impaired by Asperger's, although he can follow written instructions very well if they are clearly written out and he can follow spoken instruction very well. Dr. Parvez observed that plaintiff's judgment was intact. Any difficulty with responding appropriately to supervision, co-workers and usual work situations is allegedly caused by Asperger's. Any problems dealing with changes in a routine work setting are alleged to be caused by Asperger's.

Because there is no evidence that plaintiff's asthma significantly limits his physical or mental ability to perform basic work activities, the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's asthma is a nonsevere impairment.

## VII.   MEDICAL OPINIONS

Plaintiff argues that the ALJ erred in failing to consider all the evidence, including the evidence of plaintiff's treating physicians, when assessing plaintiff's residual functional capacity. First I will address plaintiff's step-by-step analysis of the ALJ's opinion of plaintiff's limitations.

**Activities of daily living.** Plaintiff argues that although the ALJ said that plaintiff reported he has very little difficulty with activities of daily living, (1) in his Function Report plaintiff said he has trouble sleeping and that stress causes problems with his bowels, and (2) in a third party function report plaintiff's mother reported that plaintiff has to be reminded to eat regularly.

In his Function Report, plaintiff wrote, "Sleep is often difficult if my environment or routine are changed." The medical records do not support this allegation. Instead, they show that on September 2, 2009, plaintiff said he had stopped taking Citalopram for anxiety because

it disrupted his sleep schedule. Eleven months later, on August 4, 2010, he said he had "some sleep issues maybe a third of the time due to anxiety. On that same day, he was prescribed medication for anxiety. Before that, he had been "riding out" his episodes of anxiety which were described as lasting for about 15 minutes each and occurring about 3 times a week with no resulting sleep problems.

On October 8, 2009, plaintiff denied insomnia. On December 11, 2009, plaintiff denied insomnia. On March 12, 2010, plaintiff denied insomnia. On August 4, 2010, plaintiff denied insomnia. On November 10, 2010, plaintiff denied insomnia. On December 22, 2010, plaintiff denied insomnia. On May 20, 2011, plaintiff denied insomnia. On August 29, 2011, plaintiff denied insomnia.

There is no mention anywhere in any medical records of problems with bowels, and plaintiff fails to explain how his ability to perform any basic work activity would be reduced as a result of this bowel problem he alleges only in a Function Report.

In the third party function report plaintiff cites to as support for his needing to be reminded to eat, I note that his mother also stated that "we do not spend much time together anymore". She reported that plaintiff does not take care of anyone else which conflicts with plaintiff's report that he cares for his son and his disabled mother, and he assists his grandparents as needed. His mother said he is unable to prepare his own meals, and this conflicts with plaintiff's own report that he prepares his own meals from scratch every day. Finally, I note that plaintiff weighed 70 kilograms on July 8, 2009 (his earliest medical record), he weighed 73.4 kilograms on August 29, 2011 (his latest medical record with recorded weight), and every one of Dr. Belden's treatment records note no loss of appetite or weight loss. Clearly any eating problems were not significant as plaintiff's weight remained steady for the

entire duration of the medical records, and loss of appetite and weight loss were found not to exist during the entire duration of these records.

Plaintiff points to other alleged inconsistencies in the ALJ's discussion of plaintiff's activities of daily living compared to the record, but plaintiff cites only to his mother's third party function report as evidence and that is not a credible document as discussed above. Further, plaintiff's argument that his difficulties performing daily activities is supported by his mother saying that plaintiff does not clean his car, leaves dishes for others to do, and fails to do chores others have asked him to do is belied by his own statements that he socializes with friends by going to the movies, going camping and going hiking; that he eats in restaurants occasionally; that he plays video games; that he plays the piano and writes poetry; and that he is better able to care for his son than his son's mother. Plaintiff's argument only establishes that he willingly does things he enjoys but he may not be so willing to do things he does not enjoy.

**Social Functioning**. Plaintiff argues that the ALJ improperly relied on the fact that plaintiff held jobs in management and part time as a music director of a church. Again, plaintiff cites extensively to the third party function report of his mother and the letter written by his mother as evidence contradicting the ALJ which is not persuasive. Plaintiff then cites to Dr. Belden's medical records showing that plaintiff had been prescribed medication for "his condition" and discusses plaintiff's anxiety.

The medical records show that plaintiff was on the same dose of the same medication for attention deficit disorder from his alleged onset date through the date of his last treatment record. At the time of his alleged onset date, plaintiff was having about 45 minutes total of anxiety each week and was just riding it out without medication. In August 2010 plaintiff asked Dr. Belden to prescribe a medication for anxiety. Buspirone was prescribed and then

changed to Venlafaxine three months later due to sweating. Plaintiff stopped taking Venlafaxine due to nausea. In February 2011, Dr. Parvez assessed anxiety not otherwise specified, but plaintiff was not taking any anti-anxiety medication at the time. Vistaril was prescribed "as needed" but plaintiff apparently either never took it or stopped taking it shortly thereafter because in May 2011 it was not listed as a current medication and in August 2011 plaintiff asked Dr. Belden to put him back on Carbamazepine for anxiety and there was no mention of the Vistaril plaintiff had been prescribed earlier in the year.

There are almost no medical records which include an observation that plaintiff's mood was anxious. On September 2, 2009, plaintiff was noted to be cooperative with appropriate mood and affect. On October 8, 2009, he was cooperative with appropriate mood and affect. On December 11, 2009, he was cooperative with appropriate mood and affect. On March 12, 2010, he was cooperative with appropriate mood and affect. On August 4, 2010, he was cooperative with appropriate mood and affect. On September 30, 2010, he was cooperative with appropriate mood and affect. On November 10, 2010, he was cooperative with appropriate mood and affect. On December 22, 2010, he was cooperative with appropriate mood and affect. On February 15, 2011, plaintiff was described as pleasant, interactive, alert, and cooperative but with an anxious mood. Vistaril was prescribed for anxiety, but it is unclear whether plaintiff ever took that medication as it was not listed on his next medical record three months later in May 2011 and he asked his doctor to prescribe an anti-anxiety medication at the next medical visit in August 2011. Backing up, on May 20, 2011, he was again observed to be cooperative with appropriate mood and affect. On August 29, 2011, he was observed to be cooperative with appropriate mood and affect.

Plaintiff points out that he "had at least 30 jobs, he was 32 years old" to support his argument that the ALJ erred in finding that he is not disabled due to his impaired social

functioning. I point out, however, that 14 of those jobs were held while plaintiff was a teenager. He testified he was able to hold several jobs for up to 3 years at a time. Further, his reasons for leaving employment (he had to work late on Saturdays which made it hard for him to get up for his Sunday job, and his relocation from Memphis, Tennessee, to Columbia, Missouri) are not persuasive of disabling symptoms.

And finally I will address plaintiff's argument that the ALJ improperly discredited the opinions of his treating physicians.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings; consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ had this to say about the opinions of Dr. Belden, Dr. Parvez, and Dr. Johnstone:

The record further shows that the claimant reestablished care with his family physician, **Jeffery Belden, M.D.**, in July 2009 and treatment notes indicate the claimant continued to be seen by Dr. Belden through August 2011. The treatment notes indicate Dr. Belden has prescribed various medications for the claimant's conditions of asthma, ADD, and anxiety, with the asthma and ADD medications being noted as successful and remaining unchanged for a long period of time. Dr. Belden also treated the claimant for anxiety with trials of various anxiety medications. In August 2010, treatment notes indicate the claimant by history has had "fairly disabling anxiety, complicating his

36

Asperger's syndrome". Upon examination on that visit and in each of the other visits, however, the claimant was noted as alert, oriented, in no acute distress, cooperative, and had an appropriate mood and affect. Claimant's counsel argues in his brief that a note on November 10, 2010, indicates the claimant's anxiety is such that he soaks through his shirt with sweat. This comment under the "History of Present Illness," however, does not seem to be related to the claimant's anxiety, but rather to the side effects caused by the prescription medication buspirone. In December 2011, Dr. Belden provided a narrative report stating that the claimant would have difficulty maintaining employment due to erratic and avoidant behavior as well as poor follow-through. Dr. Belden believed that the claimant would require job coaching in order to be successful a[t] maintaining employment. Dr. Belden's opinions are inconsistent with the substantial evidence of record including his own mental status observations of the claimant, and especially with the claimant's actual work history. The claimant has had his mental impairments for his entire life, and the record indicates that he has held employment for years at a time. For these reasons, these opinions are given little weight with regard to the claimant's ability to sustain gainful employment.

(Tr. at 21-22) (emphasis added).

In February 2011, the claimant was given a psychiatric evaluation by **Saleh Parvez, M.D.** Dr. Parvez noted the claimant's mood was anxious, but otherwise he was oriented, cooperative, and his thought processes were logical and goal-directed. In addition, his memory, attention, insight, and judgment were intact. His fund of knowledge was above average. Even with these findings, Dr. Parvez opined that the claimant might have difficulty in maintaining and performing well in a steady job for a reasonable time because of limitations caused by Asperger's. Dr. Parvez diagnosed the claimant with: ADHD, getting treatment, stable by medication; anxiety, not otherwise specified; and Asperger's disorder. In addition, Dr. Parvez assessed the claimant with a Global Assessment of Functioning score of 45 indicating serious symptoms at the time of the examination. A GAF score is a clinician's rating of an individual's overall psychological, social and occupational functioning, on a scale of 0 to 100, at the time the assessment is made. Thus, a GAF score is a snapshot of an individual's ability to function at a specific point in time and, therefore, does not provide significant insight into a claimant's ability to perform work activities on a regular and continuing basis. Additionally, GAF scores consider factors unrelated to the basic mental activities necessary for competitive work, further limiting their relevance in this proceeding. Further, Dr. Parvez's opinion regarding the claimant's ability to maintain employment and the assigned GAF score are inconsistent with the findings during the examination that the claimant was anxious but otherwise in no particular distress. The opinion is also inconsistent with the claimant's significant work history. For these reasons, Dr. Parvez's opinion is given little weight.

(Tr. at 22-23) (emphasis added).

In December 2011, the claimant was evaluated by **Dr. Johnstone** at the University of Missouri Department of Health Psychology. Under Dr. Johnstone's supervision, the claimant was administered various cognitive functioning examinations and determined to be "very bright from a cognitive perspective". However, Dr. Johnstone opined that

the claimant would not be able to hold competitive employment for at least a year. He further indicated that the claimant would benefit from the receipt of medical benefits allowing treatment to address his social skills deficits, learn how others perceive his behaviors, and to address his anxiety. Dr. Johnstone's opinion was that subsequent to treatment for the Asperger's condition and the related social and psychological impairments the claimant might be able to return to the work force and that the claimant would be a good candidate for Vocational Rehabilitation. Dr. Johnstone interviewed the claimant and reviewed medical records and information supplied by the claimant's attorney, but does not indicate performing any mental status examination. The opinion appears to be based in large part on the claimant's subjective complaints and the undersigned has found the claimant to be less than fully credible [a finding not appealed by plaintiff]. In addition, Dr. Johnstone interviewed the claimant only on this one occasion and the doctor's broad statements regarding "many individual's [sic] with Asperger's disorder" are inconsistent with the claimant's work history, level of activities of daily living, and social functioning found in the evidence of record. For these reasons, and because the opinion is inconsistent with the substantial weight of the evidence, it has been given little weight.

In addition, Dr. Johnstone also indicated in his referral information that the "[c]urrent Thompson Center goals are to assist Mr. Falls in obtaining social security disability and Medicaid". This stated goal suggests a potential bias in the opinions from the Thompson Center and other related entities of the University of Missouri regarding the ability of the claimant to sustain gainful employment. Furthermore, the record shows that the claimant has a lengthy history of being able to sustain gainful employment despite his mental impairments. The record suggests that the only thing that has changed with regard to the claimant's impairments since his alleged onset date of disability is a confirmed diagnosis.

(Tr. at 23) (emphasis added).

Jeffery Belden, M.D.

The record reflects that Dr. Belden resumed treatment of plaintiff on July 8, 2009, and was plaintiff's primary care physician for the duration of the record. Plaintiff saw Dr. Belden 10 times for treatment, always for "medication refills and follow up." Subsequent to all of those visits, on December 21, 2011, Dr. Belden wrote a letter to whom it may concern which is the subject of plaintiff's argument.

Dr. Belden said he could not imagine plaintiff holding down a job for any length of time. This is a decision reserved for the Commissioner and is entitled to no weight. McDade v.

<u>Astrue</u>, 720 F.3d 994, 1000 (8th Cir. 2013); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 994 (8th Cir. 2005).

Dr. Belden wrote that "[a]lthough plaintiff has a pleasant appearance and often has a smile, his behavior is pretty erratic and having a conversation with him feels exhausting. His follow-through is horrible. He has problematic relationships with his mother, his grandmother, and his ex-wife. He demonstrates avoidance behavior in many realms of life (follow-up to medical recommendations, performing agreed upon duties at home, etc.)." There is no mention of plaintiff's erratic behavior in any of Dr. Belden's treatment records. There is no mention in the treatment records of any difficulty having a conversation with plaintiff. There is no evidence of "horrible" follow-through in any of the treatment records. In fact, plaintiff came back for follow-up visits as instructed and there was no allegation of non-compliance with treatment. The allegations with regard to plaintiff's family relationships and avoiding agreed-upon duties at home are clearly from plaintiff or a family member and are not supported in Dr. Belden's treatment records.

Dr. Belden noted that providing mental health treatment to plaintiff has been "most challenging." However, again, there is nothing in his treatment records to support this. He kept plaintiff on the same dose of Adderall for years, and he prescribed anti-anxiety medication on three occasions during a 2 1/2 year period. Plaintiff never sought treatment from Dr. Belden outside the normal recommended follow-up visits for medication refills, and there is no notation of any failure to comply with treatment or failing to show up for scheduled appointment.

Finally, Dr. Belden stated that plaintiff would need persistent job coaching, that plaintiff could not successfully perform job duties, and that he would need significant accommodation

from his employer.  These opinions are outside Dr. Belden's area of expertise and are decisions reserved for the Commissioner.  Id.

Saleh Parvez, M.D.

Plaintiff saw Dr. Parvez one time, on February 15, 2011.  In that record, he stated that he would "not be surprised that Mr. Falls will have difficulty in maintaining and performing well in a steady job for a reasonable time due to his limitation by Asperger's."

Dr. Parvez's observations consist of the following:  plaintiff was a gentleman, he was pleasant, he was interactive, he showed no obsessive compulsive disorder symptoms, he showed no panic disorder symptoms, he showed no post-traumatic stress disorder symptoms, he showed no classic symptoms of mania, he was alert, he was oriented times four, he was cooperative, he had full affect, he had an anxious mood, his thought content was free from psychosis except a little paranoia here and there, his thought processes were logical and goal directed, his attention was intact, his memory was intact, his insight was intact, his judgment was intact, his fund of knowledge was above average.  He noted that plaintiff's ADHD was stable with medication.

Any negative findings on Dr. Parvez's part were based not on his own observations or testing but on reports of others:  "According to his mother's statement," he gets easily irritable and inappropriate verbally.  Dr. Parvez prescribed Vistaril (an anti-anxiety medication) and told plaintiff to come back in three months or as needed.  However, plaintiff never returned to see Dr. Parvez for treatment after obtaining this opinion about plaintiff's ability to work, and plaintiff did not list Vistaril as a current medication on his next medical visit with his primary care doctor, leaving the impression that plaintiff saw Dr. Parvez in order to secure disability benefits rather than for treatment of his allegedly disabling impairment.

<u>Brick Johnstone, Ph.D.</u>

Plaintiff saw Dr. Johnstone on one occasion, December 23, 2011, for the stated purpose of "assist[ing] Mr. Falls in obtaining social security disability and Medicaid."  As the ALJ noted, Dr. Johnstone did not perform any tests, he merely interviewed plaintiff. In fact, his findings mirror plaintiff's statements during that interview:

▸ Plaintiff said his primary symptoms of Asperger's relate to social difficulties; Dr. Johnstone did not record any observations with respect to limitations in social functioning but found that plaintiff's most prevalent symptoms of Asperger's include significant limitations in social functioning.

▸ Plaintiff said that he has difficulty understanding social cues; Dr. Johnstone did not observe any difficulty with plaintiff's ability to understand social cues but found that plaintiff "has difficulties interacting with others [and] reading social cues".

▸ Plaintiff said that he has difficulty getting along with others; Dr. Johnstone did not observe any difficulty with plaintiff's ability to get along with any other person, but he found that plaintiff has difficulties getting along with others.

▸ Plaintiff said that his Asperger's symptoms have caused him considerable difficulties at school and work and have kept him from finding and maintaining consistent competitive employment; Dr. Johnstone found that plaintiff's Asperger's has caused him "consistent difficulties in finding and maintaining competitive employment."

Dr. Johnstone's diagnostic impressions reaffirm the fact that he relied only on plaintiff's report:  He assessed "Generalized Anxiety Disorder, ***by history***;" he assessed "ADHD, ***by history***;" he assessed, "Learning Disorder, ***by history***."

Based on all of the above, I find that the ALJ properly discounted these three medical opinions and properly relied instead on the opinion of Stanley Hutson, Ph.D., and plaintiff's

treatment records excluding the three opinions discussed above. I further find that the ALJ's residual functional capacity assessment is supported by the substantial evidence in the record as a whole.

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 4, 2014